'09 CIV 5415

Christopher P. Johnson (cjohnson@kasowitz.com)
Charles M. Miller (cmiller@kasowitz.com)
Joshua M. Greenblatt (jgreenblatt@kasowitz.com)

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Tel.:   (212) 506-1700
Fax:    (212) 506-1800

Attorneys for Plaintiffs Ashland Inc. and AshThree LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

ASHLAND INC. and ASHTHREE LLC,          :

                Plaintiffs,          :          Case No. _____

        - against -          :          **COMPLAINT**

MORGAN STANLEY & CO., INC.,          :          **Jury Trial Demanded**

             Defendant.          :

-------------------------------------------------------------- x

     Plaintiffs Ashland Inc. and AshThree LLC (collectively, "Ashland" or the "Company")

for their complaint against defendant Morgan Stanley & Co., Inc. ("Morgan Stanley"), allege

upon knowledge as to themselves, and otherwise upon information and belief, as follows:

### PRELIMINARY STATEMENT

     1.     This action arises out of Morgan Stanley's false and misleading statements to,

and material omissions from, Ashland aimed at inducing the Company to purchase auction rate

securities ("ARS") from Morgan Stanley, and to hold and to continue purchasing those

securities at a time when Morgan Stanley knew the market for those ARS was collapsing.

2.     ARS are long-term bonds and preferred stock with interest rates or dividend yields that are reset through periodic auctions, typically held every 7, 14, 28, or 35 days.  ARS auctions are typically conducted by the same large financial institutions that provide the issuers of the ARS with underwriting services (the "Lead Underwriters").  The auctions are intended to enable investors to easily liquidate their ARS at the end of each period.  Based on the short intervals between auctions, ARS pay interest rates or dividend yields consistent with lower, short-term rates, but typically higher than those paid by Treasury instruments or money market instruments.

3.     Morgan Stanley's lucrative investment banking clients paid Morgan Stanley substantial fees to create and market ARS through which those clients could obtain long-term financing at cheaper, short-term rates.  Morgan Stanley also earned substantial fees as a leading manager of the auctions through which those ARS were sold and resold, and as a leading broker selling such ARS to customers.  Accordingly, Morgan Stanley reaped bigger profits from selling Morgan Stanley-brokered ARS to its customers than it would from selling those investors true "cash management" instruments.

4.     In or around May 2007, Ashland engaged Morgan Stanley to provide investment and cash management services to the Company.  In connection with that engagement, Morgan Stanley represented that it could provide Ashland with a range of short-term cash investment options, including Treasury instruments, corporate and asset-backed commercial paper and ARS.

5.     From May through August 2007, Ashland's short-term cash management investments through Morgan Stanley were primarily purchases of corporate and asset-backed

commercial paper. In or around August 2007, however, Ashland expressed concerns to Morgan Stanley regarding the exploding global financial crisis and the stability of monoline bond insurers. Morgan Stanley responded by advising the Company to shift the bulk of its investments into purchases of ARS based on student loan obligations. These student loan-backed ARS are referred to herein as "SLARS."

6. Morgan Stanley represented SLARS as safe, liquid instruments that were suitable to the Company's conservative investment policies. Moreover, Morgan Stanley represented that the Morgan Stanley-brokered SLARS were superior to other types of ARS and short-term cash-equivalent investments because Morgan Stanley-brokered SLARS were based on only the highest "quality" "performing" assets and, accordingly, were always in demand from third-party investors. In particular, Morgan Stanley touted the high credit ratings associated with SLARS and represented that SLARS were of a "superior quality" to other ARS because (i) student loans were insured by the United States government under the Federal Family Education Loan Program ("FFELP"), and, (ii) under the Federal Bankruptcy Code, student loans were not dischargeable in bankruptcy.

7. Thus, Morgan Stanley also represented that Ashland would never be left holding illiquid SLARS because Morgan Stanley-brokered SLARS were of a "quality" and type that had never experienced failed auctions. Moreover, Morgan Stanley represented to Ashland that, in the event of any instability or weakness in the market for SLARS (or any other type of ARS) – which Morgan Stanley represented to be a very "rare" occurrence – Morgan Stanley's brokers and other brokers would step in and place sufficient proprietary bids to prevent auction failure and ensure the liquidity of Ashland's SLARS. Thus, Morgan Stanley represented that Ashland would never be left holding illiquid Morgan Stanley-brokered SLARS.

3

8.      This was untrue.  In fact, SLARS were as susceptible to illiquidity as other types of ARS in the event of a collapse of the ARS market, regardless of their credit rating and FFELP guarantee and irrespective of the provisions of the Bankruptcy Code.  Morgan Stanley was well-aware that its representations concerning the superior "quality" of SLARS were not assurances of "liquidity" for these securities.  Morgan Stanley, however, failed to alert Ashland to this crucial distinction between "quality" and "liquidity."

9.      Nor did Morgan Stanley disclose to Ashland that, contrary to Morgan Stanley's representations, Morgan Stanley's substantial and continuing purchases of Morgan Stanley-brokered SLARS (and other ARS) for its own inventory were not hypothetical occurrences, but rather were nearly daily necessities required to maintain liquidity in the ARS market due to a lack of sufficient third-party demand to provide genuine liquidity for those SLARS.  The supposed worst-case scenario – Morgan Stanley's brokers stepping in to make a market for otherwise illiquid securities – was, in fact, the reality in the ARS market at the time Morgan Stanley induced Ashland to purchase SLARS.

10.     Morgan Stanley also failed to disclose to Ashland that Morgan Stanley's purchases of Morgan Stanley-brokered SLARS for its own inventory were restricted by internal limits, or that the market for Morgan Stanley-brokered SLARS would collapse if and when Morgan Stanley stopped buying the securities.

11.     Further, Morgan Stanley failed to disclose its multiple and conflicting roles in the ARS market, the substantial fees Morgan Stanley received for such conflicting roles, or Morgan Stanley's financial interest in selling Morgan Stanley-brokered SLARS rather than *bona fide* cash management investments to the Company.

12.     By August 2007, unbeknownst to Ashland, all genuine, third-party demand that had existed for ARS, including SLARS, had evaporated.  In an effort to preserve its fee generating business at the expense of clients like Ashland, however, Morgan Stanley concealed from Ashland the distress in the ARS market, and continued to represent SLARS as safe, liquid securities suitable to Ashland's conservative investment policies.  Morgan Stanley also continued to represent that Ashland would never be left holding illiquid Morgan Stanley-brokered SLARS because, in the words of Morgan Stanley, "with performing assets, you shouldn't have a liquidity problem."

13.     On or about February 12, 2008, the ARS market collapsed, primarily due to Morgan Stanley's and the other Lead Underwriters' decision to cease placing proprietary bids sufficient to prevent auctions from failing.  For more than six months prior to this collapse, Morgan Stanley was well aware of significant problems in, and a systemic risk to, the ARS market, but failed to alert Ashland to these problems.  Instead, even as Morgan Stanley became aware of the impending collapse of the ARS market in late 2007 and early 2008, Morgan Stanley continued to market SLARS to the Company aggressively, based on the purported safety and liquidity of such securities.

14.     In reliance on Morgan Stanley's representations and omissions, Ashland purchased SLARS from Morgan Stanley continuously between September 2007 and February 2008.  The collapse of the ARS market rendered completely illiquid these supposedly "safe" Morgan Stanley-broker SLARS that Ashland held, stranding Ashland with over $66 million of illiquid Morgan Stanley-brokered SLARS.

## THE PARTIES

15.     Plaintiff Ashland Inc. is a corporation created and existing under the laws of Kentucky, with its principal place of business in Covington, Kentucky.  Ashland is a leading diversified global chemical company and its division, Valvoline, makes a variety of specialized and widely known oil products.  On November 13, 2008, Ashland acquired specialty chemical company, Hercules, Inc.  Ashland has sales and operations in the United States and over 100 countries around the globe, and currently employs approximately 15,000 people in the United States and worldwide.

16.     Plaintiff AshThree LLC is a limited liability company created and existing under the laws of Delaware in which Ashland Inc. is the only member.  AshThree LLC is the current holder of the Morgan Stanley-brokered ARS at issue in this complaint.

17.     Morgan Stanley & Co., Inc. is a Delaware corporation with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331, 1332, and 1367.

19.     Venue is proper in this district pursuant to 15 U.S.C. § 78aa, because the defendant transacts business in this district.

6

# FACTS

## I.   Ashland's Conservative Investment Policy

20.   Ashland's business generally requires it to keep substantial funds readily available in the form of cash or highly-liquid assets so Ashland can satisfy a variety of business contingencies.  Ashland uses these funds to pay employees and service providers, satisfy tax obligations, invest in new business opportunities, and respond to unexpected business exigencies.  To ensure the Company's assets are managed appropriately, Ashland had and continues to have an Investment Policy ("Investment Policy") setting forth the Company's investment objectives as well as guidelines restricting investment of the Company's assets to instruments consistent with those objectives.

21.   Ashland's Investment Policy sets forth the Company's investment objectives, in order of importance, as: (i) "Safety – to protect principal"; (ii) "Liquidity – to provide funds to meet Ashland's obligations as they become due"; and (iii) "Yield – to maximize the return of all investments within the constraint of safety and liquidity."

22.   To ensure preservation of capital, Ashland's Investment Policy restricts the Company to purchasing only high-quality, low-risk investments that carry high, investment-grade ratings.  The Investment Policy repeatedly makes clear that no investment action is to be taken "at the sacrifice of safety and liquidity."

23.   Ashland provides its Investment Policy to Company employees engaged in managing the Company's assets.  Ashland also provides the Investment Policy and/or describes its contents to all financial institutions with whom the Company conducts investment or cash management business.

## II.     The MAP Transaction

24.     On June 30, 2005, Ashland completed the sale of its interest in Marathon Ashland Petroleum LLC (the "MAP Transaction"). The MAP Transaction netted Ashland approximately $1.3 billion in cash, which the Company specifically earmarked for use in a future acquisition (the "Acquisition Principal"). In particular, following the MAP Transaction, Ashland began actively looking to acquire a specialty chemical company.

25.     To preserve the safety and liquidity of that Acquisition Principal, Ashland Inc. contributed it as capital to AshThree LLC, a special purpose entity wholly-owned and operated by Ashland Inc., and directed Ashland's Treasury department to ensure that AshThree LLC could access that Acquisition Principal with little or no delay when Ashland needed it. As sole member of AshThree LLC, Ashland Inc. made all investment decisions for AshThree LLC regarding the Acquisition Principal, investing it in various money market instruments, including the ARS referenced herein.

## III.    Morgan Stanley Markets ARS To Ashland As Suitable
##         Short-Term Investments for the Acquisition Principal

### A.     Ashland Describes the Company's Investment
###        Requirements to Morgan Stanley

26.     Following the MAP transaction, Ashland was approached by Thomas Byrne ("Byrne"), a Morgan Stanley financial advisor with a longstanding relationship with Ashland. In mid-2007, Byrne and fellow Morgan Stanley employees Nicole Clayton and Chad Hueffmeier sought to bundle services – including investment banking, pension, and short term cash management – for the Company.

27.     In or around May 2007, Ashland's Assistant Treasurer, Joseph R. Broce ("Broce") met with Byrne to discuss investment alternatives, including short-term cash management, for the Acquisition Principal. At this initial meeting and in subsequent communications, Ashland explicitly described to Morgan Stanley its need for safety and, above all else, liquidity with respect to the Acquisition Principal. Ashland also provided a copy of the Company's Investment Policy and/or described its contents to Morgan Stanley.

28.     In response to Ashland's request for investment assistance consistent with its need to preserve the safety and liquidity of the Acquisition Principal and the Company's Investment Policy, Morgan Stanley provided the Company with both written and in-person presentations through which Morgan Stanley marketed itself aggressively. In particular, Morgan Stanley touted its size and the high level of investment and cash management expertise and service with which it could provide the Company.

29.     Morgan Stanley also emphasized its ability to provide Ashland with high-quality ARS, which Morgan Stanley represented as safe and liquid investment instruments suitable to, and consistent with, the Company's need to preserve the safety and liquidity of the Acquisition Principal and the Company's conservative Investment Policy.

30.     In the course of Ashland's initial discussions with Morgan Stanley concerning ARS investments, Broce asked Byrne point-blank for an assessment of "the risks" associated with an investment in ARS. Byrne told Broce "not to worry" and stated that there were "no liquidity issues" with ARS.

31.     Also in the course of Ashland's initial discussions with Morgan Stanley concerning ARS investments, Broce asked Byrne about the possibility of auction failures.

Byrne dismissed the possibility, stating that, in the event of any instability or weakness in the market, ARS brokers, including Morgan Stanley, would "come in and make the market" as they had always done in the past.

32.     In reliance on Morgan Stanley's representations and omissions, including Byrne's verbal and written statements to Broce and the Company in and around May 2007, Ashland engaged Morgan Stanley to provide investment and cash management services to the Company.

**B.     Auction Rate Securities ("ARS")**

33.     ARS are long-term bonds and preferred stock with interest rates or dividend yields that are reset through periodic auctions, typically held every 7, 14, 28, or 35 days. ARS auctions are typically conducted by the Lead Underwriters, the same large financial institutions that provide the issuers of the ARS with underwriting services. During the time period relevant to Ashland's claims, Morgan Stanley, together with its parent company and affiliated entities was the second largest Lead Underwriter in the ARS market.

34.     ARS auctions are intended to enable investors to easily liquidate their ARS at the end of each period. Based on the short intervals between auctions, ARS pay interest rates or dividend yields consistent with lower, short-term rates, but typically higher than those paid by Treasury or money market instruments. The Lead Underwriters, including Morgan Stanley, marketed ARS as advantageous to investors, representing that ARS were as safe and liquid as money market instruments, but with a slightly higher yield to compensate for the time intervals – or "holding periods" – between auctions.

35.     Financial institutions created and brokered ARS that were based on several types of debt obligations and other assets.  For example, brokers marketed ARS that were based on: (i) pools of federally insured student loans (i.e., the SLARS at issue in this matter); (ii) obligations of municipal governments, (iii) assets of closed-end investment funds; and (iv) pools of complex derivative securities tied to various types of debt, including subprime residential mortgages and commercial real estate loans.

36.     In the event the supply of ARS for sale at an auction exceeds demand, the auction would be said to "fail."  In the event of a "failed" auction, none of the investors holding those ARS could sell their securities, and the instruments would be illiquid until the next scheduled auction.  During the holding period following a failed auction, the ARS would pay investors a higher "penalty rate" or "fail rate" to penalize issuers, compensate investors for the temporary illiquidity, and create new liquidity by inducing new investors to step in and purchase the ARS to benefit from the higher interest rate.  "Fail rates" varied for different ARS, and would be determined by the terms under which the particular security had been issued.

37.     The Lead Underwriters, including Morgan Stanley, had the option but absolutely no obligation to place proprietary bids in the auctions they conducted.  Often, however, the Lead Underwriters placed proprietary bids for large numbers of ARS to ensure that the auctions did not fail.  Liquidity in the ARS market was thus dependent on the willingness of the Lead Underwriters, including Morgan Stanley, to place proprietary bids for ARS, and was not dependent upon the quality or characteristics of the ARS themselves.

IV.   **Morgan Stanley Induces Ashland to Purchase**
      **Morgan Stanley-Brokered ARS Based on**
      **Federally-Insured Student Loans ("SLARS")**

38.     Through August 2007, Ashland's ARS purchases from Morgan Stanley

primarily consisted of Treasury instruments and various types of corporate and asset-backed

commercial paper.

39.     In and around August 2007, however, Broce discussed with Byrne how best to

protect the safety and liquidity of Ashland's cash portfolio from the growing crisis in subprime

mortgages and their related securities.  Byrne advised Broce to direct more of Ashland's cash

into "taxable auction rate securities positions," which he claimed were unaffected by the

emerging issues in the financial markets.  For example, Byrne sent an email to Broce and

Spence on August 23, 2007 describing several available taxable ARS listings and stating:

> "I believe we could eventually look at these as alternatives to CP [commercial
> paper] purchases.  Active, taxable, AAA market, auctions everyday, good size
> issues, <u>unrelated to current problems</u>.  lets [sic] discuss when you have some
> time." (emphasis supplied)

40.     Likewise, on August 31, 2007 Byrne sent an email to Broce and Spence pitching

"attractive taxable ideas" and declaring that "[t]axable auctions in place of CP is a theme many

clients are considering and approving.  Worth a discussion.  <u>Not related to Sub prime and AAA</u>

<u>rated</u>." (emphasis supplied)

41.     In particular, in and around August 2007, Byrne began marketing taxable

SLARS to the Company as an "attractive" means of extracting "value" from the ARS market

without exposure to "sub prime" issues.

42.    In reliance on Morgan Stanley's representations and omissions, Ashland began purchasing Morgan Stanley-brokered SLARS from Morgan Stanley on September 25, 2007.

**A.    Morgan Stanley's Representations to Ashland
Concerning the Purported Advantages of SLARS**

43.    To induce Ashland to purchase SLARS from Morgan Stanley, Byrne and Morgan Stanley represented to Broce and Ashland that the ARS Morgan Stanley brokered, including SLARS, were of the highest available quality and that this "quality" would ensure "liquidity." Morgan Stanley represented that, like other Morgan Stanley-brokered ARS, SLARS were comparable to money market instruments in terms of safety and liquidity and offered Ashland an ideal means of protecting the safety and liquidity of the Acquisition Principal consistent with the Company's express directive and Investment Policy.

44.    Morgan Stanley repeatedly represented to Ashland that instances of "failures" and "instability" in the ARS market were very rare. Morgan Stanley represented that it had never allowed an auction to fail and would continue to act to prevent such an occurrence because, among other things, its brokers would "come in and make a market" for Morgan Stanley-brokered ARS, including SLARS. Thus, Morgan Stanley assured Ashland that the Company would never be left holding illiquid Morgan Stanley-brokered SLARS.

45.    In particular, Morgan Stanley represented that Morgan Stanley-brokered SLARS would provide Ashland the utmost safety, liquidity and protection from the subprime mortgage crisis or otherwise because SLARS: (i) enjoyed reliable demand and liquidity due to their high quality; (ii) were not connected to the market for subprime mortgages and related securities; (iii) nearly always carried AAA credit ratings from agencies such as Moody's and Fitch, which Morgan Stanley represented as evidence of the safety and liquidity of the instruments; (iv) were

based on the highest-quality student loans backed by the United States government under the Federal Family Education Loan Program ("FFELP"); and (v) were based on assets – student loans – that were not dischargeable in bankruptcy under the Federal Bankruptcy Code.

46.     Morgan Stanley relied especially on the FFELP guarantee and credit ratings for SLARS as a one-two punch in urging Ashland to purchase Morgan Stanley-backed SLARS. For example, on December 11, 2007, Byrne sent an email to Broce forwarding some "helpful" comments "from our head trader on auction rate securities." Among other things, these comments by Morgan Stanley's head ARS trader highlighted the purported benefits associated with the FFELP guarantee on SLARS. The comments stated, in relevant part:

> "The FFELP program, which supports many of the loans in the underlying portfolios of student loans, provides for reimbursement from the Department of Education for up to 99% of the principal should the loans in the underlying portfolio default (i.e. students don't pay their loans). Issuers who issue student loan-backed notes, such as EdSouth, Brazos, Michigan Higher Ed, NorthStar Guarantee, PHEAA, etc, originate, service and finance loans under the FFELP program. Because of the reimbursement program and a certain amount of over collateralization in the structure, the rating agencies apply the highest ratings to the bonds, triple-a. The FFELP program, which stands for the Federal Family Education Loan Program, is generally considered one of the strongest backings in the asset-backed market."

47.     Morgan Stanley thus cited the FFELP guarantee on Morgan Stanley-backed SLARS as purported evidence of their superior quality and safety and advised Broce that, because SLARS enjoyed the benefit of federal guarantees, their high credit ratings were not dependent on guarantees provided by the so-called "monoline" insurance companies, as was the case with many other ARS types.

48.     To that end, when Morgan Stanley transmitted SLARS offerings to the Company it included and highlighted the FFELP guarantee and credit rating in the listing. For example,

an email sent from Byrne to Broce on August 28, 2007 listed typical SLARS offerings as

follows:

| | |
|---|---|
| $12,500,000 | Pennsylvania Higher Education Assistance Agency PHEAA<br>709163FH7<br>**Aaa/AAA 100% of FFELP** 28 Day Reset / Next 9/21/2007<br>5.80% Coupon   1 mL + 30bps |
| $11,000,000 | Access Group, Inc. 2004-1 00432BBP5<br>**Aaa/AAA 100% of FFELP** 28 Day Reset / Next 9/19/2007<br>5.75% Coupon   1 mL + 25bps |

(emphasis supplied)

49.     Byrne also repeatedly represented to Broce that no auction for SLARS had ever

failed and that, in the event of any instability or weakness in the ARS market, Morgan Stanley

brokers would place proprietary bids to prevent auctions for Morgan Stanley-brokered SLARS

from failing.

50.     Morgan Stanley also represented that it could ensure immediate liquidity for the

SLARS sold to Ashland because, in addition to the high "quality" of SLARS and the FFELP

guarantee, the provisions of the Federal Bankruptcy Code purportedly prevented students from

discharging their student loan obligations in bankruptcy.  Morgan Stanley represented that these

factors would always attract other investors to purchase Morgan Stanley-brokered SLARS and

ensure their liquidity.  As Byrne repeatedly put it in conversations with Broce: "The assets will

perform."

**B.      Morgan Stanley's Omissions to Ashland**
        **Concerning SLARS**

51.     Ashland was not provided with a prospectus for any of the SLARS sold to it by

Morgan Stanley until <u>after</u> the auctions had concluded.  Morgan Stanley presented this practice

as typical and unavoidable because of the rapidity with which the interest rates were set and the SLARS auctions were conducted.

52.     Throughout the period during which Morgan Stanley continued to sell Morgan Stanley-brokered SLARS to Ashland – representing that those SLARS were safe, liquid, suitable to the Company's Investment Policy and superior to other types of ARS because they were "FFELP-wrapped," highly rated, and non-dischargeable in bankruptcy – Morgan Stanley failed to disclose the true liquidity risks associated with Morgan Stanley-brokered SLARS to Ashland.

53.     In particular, Morgan Stanley failed to advise Ashland that: (i) as with other ARS, there was frequently less demand than supply at SLARS auctions, including auctions for Morgan Stanley-brokered SLARS; (ii) that Morgan Stanley was frequently required to purchase Morgan Stanley-brokered SLARS for its own inventory to prevent auction failure and, accordingly, without Morgan Stanley's substantial and continuing ability and/or willingness to purchase SLARS for its own inventory, SLARS would become illiquid; (iii) that the FFELP-guarantee associated with Morgan Stanley-brokered SLARS was not a guarantee of increased liquidity regardless of the "quality" of these instruments; and (iv) that Byrne's representation concerning the non-dischargeability of student loans in bankruptcy, even if true, was not a guarantee of increased liquidity in the event of a failure of the market for ARS and SLARS.

54.     Morgan Stanley also failed to disclose that the AAA ratings associated with Morgan Stanley-brokered SLARS were achieved at the expense of maximum "fail rates" or "penalty rates" high enough to ensure liquidity by attracting secondary market buyers or incentivizing issuers to redeem the SLARS in order to avoid paying the high rates.  Because higher maximum fail rates make it less likely that, in the event of a failure, all security holders

will receive interest and principal when due, high maximum fail rates jeopardize AAA ratings. While low maximum fail rates help protect such ratings, they come at the expense of liquidity, because low maximum fail rates are not as attractive to investors. Accordingly, even while Morgan Stanley continued to highlight the AAA ratings on the SLARS it marketed to Ashland, Morgan Stanley failed to disclose to Ashland that AAA-rated SLARS were more likely to remain illiquid in the event of auction failure.

55.     Thus, while ARS with particularly high maximum rates, such as municipal bond-backed ARS with maximum rates in the range of 12-15%, continued to have successful auctions even after the implosion of the ARS market in February 2008, the AAA-rated, "FFELP-wrapped" SLARS sold to Ashland by Morgan Stanley were in fact rendered illiquid because they had low maximum fail rates insufficient to draw investor interest or incentivize their issuers to offer a redemption. When marketing the SLARS, Morgan Stanley failed to disclose these low rates to Ashland, even though Morgan Stanley knew or should have known that low rates would negatively impact the liquidity of the SLARS in the event of disruptions in the ARS market.

56.     Morgan Stanley also failed to disclose to Ashland that, contrary to Morgan Stanley's representations, Morgan Stanley was not committed to ensuring liquidity for Morgan Stanley-brokered SLARS any more than for other types of ARS. Rather, as Morgan Stanley knew, but concealed from Ashland, Morgan Stanley's commitment to providing liquidity for SLARS would extend only insofar as it deemed providing such liquidity to be in its own commercial best interests and, to protect itself, Morgan Stanley had imposed a limit on the number of SLARS it would purchase for its own inventory. Thus, Morgan Stanley failed to disclose to Ashland that, when it reached its SLARS inventory limits, it would cease placing

proprietary bids for SLARS, including Morgan Stanley-brokered SLARS, which in turn would severely affect the liquidity of Ashland's SLARS holdings.

57.     Finally, at no time did Morgan Stanley disclose to Ashland the extent of Morgan Stanley's financial interest in helping to maintain the market for SLARS for the purpose of generating fees for itself, both through commissions and through its underwriting activities. Nor did Morgan Stanley disclose the degree to which it and its financial advisors, including Byrne, increased their own profits by selling Morgan Stanley-brokered SLARS, rather than *bona fide* cash management instruments, to Morgan Stanley customers.

V.     **Morgan Stanley Fails to Disclose Systemic Risk in the ARS Market and Continues to Push SLARS on Ashland**

A.     **Morgan Stanley was Aware of Significant Problems in the ARS Market by August 2007 but Failed to Disclose these Risks to Ashland**

58.     Morgan Stanley was aware of auction failures and significant disruptions in the ARS market during August of 2007.  Unbeknownst to Ashland, but well known to Morgan Stanley, a portion of the ARS created and sold by the Lead Underwriters were tied to complex derivative securities, including securities related to subprime mortgages (*i.e.*, loans made to borrowers with troubled credit).  Morgan Stanley had never disclosed to Ashland that such ARS existed.  While Morgan Stanley had not sold such derivative-based ARS to Ashland, these securities linked the ill-fated market for subprime mortgage-related securities to the SLARS that Morgan Stanley sold to the Company, notwithstanding Morgan Stanley's repeated representations that SLARS were not related to or impacted by the subprime crisis.

59.     Specifically, in early 2007, mortgage industry data showed increasing defaults among homeowners with subprime mortgages.  As has been reported widely in the subsequent

months, banks had packaged trillions of dollars of those mortgages into bonds that were, in turn, repackaged into complex derivative securities.  Credit rating agencies accorded many of these complex derivatives high investment grade ratings.  In the spring of 2007, continuing distress in the subprime mortgage market led the rating agencies to begin downgrading the complex subprime mortgage-related derivatives causing their values to plummet.  As a result, by early summer 2007, investors sought to unload billions of dollars of these complex derivatives, further driving down their values.

60.    Prior to August 2007, the Lead Underwriters, including Morgan Stanley, had routinely acted as market makers for ARS tied to complex derivatives, buying for their own inventories derivative-related ARS for which there were no third party bids to prevent failed auctions.  As the values of derivatives began to plummet, however, Lead Underwriters, including Morgan Stanley, chose to stop supporting auctions for ARS whose value was tied to such derivatives to avoid getting stuck with distressed ARS.  As a result, beginning August 2, 2007, at least 96 auctions for ARS tied to complex derivatives failed, leaving institutional and corporate investors stuck with nearly $9 billion of illiquid ARS.

61.    In the weeks following the August 2007 auction failures, institutional and corporate investors that had become trapped holding illiquid derivative-related ARS sought to liquidate tens of billions of dollars of other ARS types – including the type of SLARS that Morgan Stanley had sold to Ashland – based upon the fear that those ARS would also become illiquid.  Because all ARS purchases and sales are private transactions that are not publicly reported, Ashland was not aware of the collapse of the market for derivative-related ARS, or the subsequent run on the bank with respect to ARS, including the SLARS Morgan Stanley had

been selling to the Company.  Neither Byrne nor anyone else at Morgan Stanley disclosed any of these facts to Broce or anyone else at Ashland.

62.     The increased supply of ARS into the auction market significantly outstripped third party demand for such securities, leaving brokers, including Morgan Stanley, to choose between buying ever increasing amounts of those ARS for their own inventories, or allowing auctions for those ARS to fail.  Because Morgan Stanley and other brokers had marketed ARS to investors such as Ashland as highly-liquid "cash equivalents," they knew that even a few failed auctions would likely cause all remaining investors to flee those ARS, destroying what had been a lucrative market for Morgan Stanley and other Lead Underwriters.  Accordingly, Morgan Stanley and other ARS brokers chose to conceal from investors such as Ashland the rapid loss of liquidity from the broader ARS market by increasing purchases of ARS, including SLARS, for their own inventories, thereby saving those auctions from failing.  At no time was Ashland aware that genuine liquidity for ARS, including SLARS, was disappearing or that the market was becoming increasingly dependent upon intervention by Morgan Stanley and other Lead Underwriters for liquidity.  Despite Morgan Stanley's awareness of these circumstances, neither Byrne nor anyone else at Morgan Stanley disclosed any of these facts to Broce or anyone else at Ashland.

63.     For a time, Morgan Stanley and the Lead Underwriters succeeded in preventing auction failures and concealing the loss of liquidity for ARS by purchasing tens of billions of dollars of those ARS, including SLARS, for their own inventories.  These efforts, however, required the Lead Underwriters, including Morgan Stanley, to use their own increasingly scarce cash at the very time they were facing hundreds of billions of dollars of losses from toxic mortgage-related securities.  As their own impending liquidity crisis grew more severe, the

Lead Underwriters, including Morgan Stanley, began in the fall of 2007 to consider how and when to end their practice of using their own cash to buy ARS for which there was no third party demand.

64.    Morgan Stanley failed to disseminate accurate information concerning these issues to Ashland.  On the contrary, notwithstanding that Morgan Stanley was, at all relevant times, aware of Ashland's need to preserve the safety and liquidity of the Acquisition Principal and of the Company's conservative Investment Policy, neither Byrne nor anyone at Morgan Stanley advised Broce or anyone at Ashland that, at the time Morgan Stanley was inducing Ashland to purchase Morgan Stanley-brokered SLARS, (i) Morgan Stanley was aware of substantial disruptions in the market for SLARS and other ARS; (ii) Morgan Stanley was aware that these disruptions posed a danger of illiquidity for the SLARS marketed to Ashland regardless of the fact that the SLARS were not "related" to the subprime crisis; and (iii) Morgan Stanley was aware that the penalty rates on SLARS were too low to ensure liquidity in the event of auction failures.

65.    On the contrary, Morgan Stanley continued to emphasize purported "value" in the ARS market in its communications and sales pitches to Ashland in the second half of 2007. For example, on August 28, 2007, Byrne sent an email to Broce, titled "FW: Value in the Auction-Rate market," and stating, in relevant part:  "The [ARS] desk expects the market to continue to offer value over the next couple of weeks so as corporate accounts stay short leading into their September quarter-end."

66.      Likewise, on August 31, 2007 Byrne sent an email to Spence and Broce listing Morgan Stanley-brokered SLARS offerings and stating, in relevant part: "These are the resets on a few taxable SLM Student loan issues. Pretty attractive." (Emphasis added.)

67.      And on November 28, 2007, Byrne sent an email to Broce attaching a list of available SLARS, suggesting that Morgan Stanley would be "flexible on settle[ment]," and exhorting Broce and Ashland to "keep the momentum going please!" (Emphasis added.)

## B.      Morgan Stanley Downplays or Ignores the Failure of ARS Auctions in Late 2007 and Early 2008

68.      In December 2007, Ashland learned that Goldman Sachs ("Goldman"), a significant member of the Lead Underwriters like Morgan Stanley, had allowed the failure of a SLARS auction issued by student lender First Marblehead and underwritten by Goldman. While Ashland did not own First Marblehead SLARS, Ashland was alarmed by news of the auction failure. Accordingly, Broce contacted Byrne to discuss the First Marblehead situation and to inquire whether there were any potential delays, failures or other issues relating to Morgan Stanley-brokered SLARS.

69.      Byrne responded in a December 11, 2007 email to Broce, which forwarded comments by Morgan Stanley's head ARS trader and drew a strong distinction between the liquidity problems experienced by First Marblehead SLARS and the FFELP-backed SLARS that Morgan Stanley continued to market to Ashland. The email stated, in relevant part:

> There are other types of student loans out there, namely Private Loans, which do not carry the FFELP guarantee. The largest originator and servicer is First Marblehead. The bonds that First Marblehead issue in the auction-rate market are NOT backed by the Federal Government. These loans and that Issuer, First Marblehead, were the subject of some recent press. The FFELP program, however, must be differentiated from the non-FFELP program due to the fact that

FFELP is supported by the Department of Education whereas the Private Loans are just that, private loans issued, most frequently, outside of college financial aid offices and do not carry a Government support program. Often times, Issuers that may have Private Loans in their pools will procure a municipal bond insurance policy (similar to the municipal issuers) to get the rating agencies comfortable with the structure.

70.    At no time did Byrne suggest that the First Marblehead failure was indicative of any systemic risk to the ARS market. Nor did Byrne advise Ashland that the FFELP program would not ensure liquidity of Morgan Stanley-brokered SLARS regardless of its effect on the "quality" of these instruments. On the contrary, Byrne sought to use the First Marblehead failure as a means of selling more SLARS to the Company by highlighting the fact that the Morgan Stanley-backed SLARS had a FFELP guarantee and the First Marblehead SLARS did not. Byrne also represented the First Marblehead failure as an "aberration" and blamed the failure on Goldman's "unorthodox" investment approach. Byrne represented to Broce that Morgan Stanley-brokered SLARS remained safe, liquid and suitable investments for Ashland and assured Broce that strong investor demand for the high-quality, Morgan Stanley-brokered SLARS would ensure continuing liquidity for those SLARS.

71.    Morgan Stanley continued to aggressively market SLARS to the Company in late December and early January 2008. For example, Byrne and another Morgan Stanley employee, Susan Resnik ("Resnik"), emailed Broce lists of available Morgan Stanley-brokered SLARS to solicit SLARS purchases by Ashland on December 10, 11, 17, 18, 19, and 31, 2007, and on January 14, 15, and 22, 2008, among other days. Not once did any of these emails or any other communication from Morgan Stanley to Ashland reference or discuss the systemic problems in the ARS market, of which Morgan Stanley was aware.

72.     In reliance on Morgan Stanley's continued representations and omissions, Ashland continued to hold the Morgan Stanley-brokered SLARS it had purchased and made additional purchases of SLARS from Morgan Stanley.

73.     On January 23, 2008, Lehman Brothers ("Lehman"), a substantial Lead Underwriter of ARS, chose not to place a necessary proprietary bid in some auctions, causing these auctions to fail. Several days after the Lehman failure, Piper Jaffrey ("Piper"), another financial firm that ran and supported ARS auctions, chose not to place sufficient proprietary bids and allowed auctions to fail. Morgan Stanley was aware of these and other failures but did not flag them for Ashland. Nor did Morgan Stanley disclose that these failures were indicative of substantial systemic disruptions in the ARS market.

74.     On the contrary, Morgan Stanley continued to aggressively market SLARS to the Company. Indeed, Byrne and fellow Morgan Stanley employee Susan Resnik contacted Broce by email at least 50 times between August 2007 and the collapse of the ARS market in February 2008 in an effort to market Morgan Stanley-backed SLARS to Ashland. While Byrne's emails often described Morgan Stanley's SLARS offerings as "attractive", neither Byrne nor anyone else at Morgan Stanley ever disclosed to Ashland the substantial and growing systemic risk to the ARS market of which he and Morgan Stanley were aware throughout the time of these communications.

75.     In reliance on Morgan Stanley's continued representations and omissions, Ashland continued to hold the Morgan Stanley-brokered SLARS it had purchased and made additional purchases of Morgan Stanley-brokered SLARS.

**VI.    The Collapse of the ARS Market Strands Ashland with Over $66 Million of Illiquid Morgan Stanley-Brokered SLARS**

76.    As the implosion of the ARS market unfolded, Ashland directed Morgan Stanley to begin liquidating its holdings of Morgan Stanley-brokered SLARS.  Contrary to Morgan Stanley's repeated representations concerning the quality, safety and liquidity of SLARS, however, Byrne advised Broce that Morgan Stanley could not and would not provide or ensure liquidity for any Morgan Stanley-brokered SLARS held by Ashland, including the Morgan Stanley-brokered SLARS Byrne had touted as safe, liquid and "attractive" just days earlier.

77.    Thereafter, Ashland discovered that, without Morgan Stanley stepping in to provide liquidity for the SLARS sold to Ashland, those SLARS were illiquid because, contrary to Morgan Stanley's representations, there was not enough third-party demand to keep the auctions from failing, regardless of the SLARS' purportedly high credit quality, purported guarantee under FFELP and supposed non-dischargeability in bankruptcy.  Accordingly, on February 12, 2008, Ashland found itself trapped with over $66 million of illiquid Morgan Stanley-brokered SLARS, as reflected in the following chart:

| Date Purchased | Name | CUSIP | Amount |
|---|---|---|---|
| 09/25/07 | Student Loan Consolidation Center Student Series 2002-1 Class A3 | 863-86M-AC8 | $15,000,000 |
| 09/25/07 | Pennsylvania St Higher ED Assistance AGY Student LN Rev | 709-163-FJ3 | $15,000,000 |
| 10/02/07 | Next Student Master Trust I | 653-37M-AW8 | $21,300,000 |
| 11/29/07 | Education Loan Asset-Backed Trust Series 2003-1 | 281-397-AH2 | $15,000,000 |

78.    Rather than help Ashland recover the $66.3 million in Morgan Stanley-brokered SLARS, Morgan Stanley has instead sought to blame the harm suffered by Ashland on "the

market" – ignoring that Morgan Stanley was aware of the ARS market's deterioration and dangers posed by SLARS and other ARS from mid-2007 at the very latest.

## VII.   Morgan Stanley's Conduct Has Injured Ashland

79.     Later in 2008, Ashland's long-sought acquisition opportunity finally materialized in the form of specialty chemical company Hercules, Inc. ("Hercules").  Because of the collapse of the ARS market on or about February 12, 2008, however, Ashland was unable to access the $66.3 million in Acquisition Principal tied up in illiquid Morgan Stanley-brokered SLARS.  As a result, to complete its November 13, 2008 acquisition of Hercules, Ashland was forced to borrow funds.  To date, Ashland has incurred millions of dollars in costs and fees associated with being forced to borrow funds to replace the cash currently trapped in Morgan Stanley-brokered SLARS.

## CLAIMS FOR RELIEF

### COUNT I
### (Fraud in Violation of Section 10(b) of the Securities
### and Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder)

80.     Ashland repeats and realleges the allegations of paragraphs 1 through 79.

81.     As set forth above, Morgan Stanley intentionally and/or recklessly: (i) employed a device, scheme and artifice to defraud Ashland with respect to the sale of SLARS; (ii) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading; and/or (iii) engaged in acts, practices or courses of business which operated as a fraud and deceit upon Ashland in connection with the sale and purchase of SLARS, in violation of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

82.     Morgan Stanley also engaged in a series of fraudulent and deceitful acts or practices, including knowingly: (i) making false statements that Morgan Stanley-brokered SLARS were safe, liquid, comparable to money market instruments, and suitable to the Company's conservative Investment Policy and specific liquidity needs; (ii) making false statements with respect to Morgan Stanley's willingness to place sufficient proprietary bids to prevent auction failure; (iii) making false statements with respect to the nature, credit quality and risks associated with Morgan Stanley-brokered SLARS; (iv) making false statements with respect to the causes of auction failures for SLARS brokered by other institutions; (v) making false statements that the safety and liquidity of Morgan Stanley-brokered SLARS were not impacted negatively by the collapse of the market for subprime mortgages and related securities; (vi) making false statements with respect to Morgan Stanley's intent and ability to never allow Ashland to be left holding illiquid Morgan Stanley-brokered SLARS; and

(vii) making false statements with respect to the higher quality and increased liquidity of SLARS compared to other ARS based on the credit ratings, FFELP guarantees and purported non-dischargeability of the underlying assets in bankruptcy associated with SLARS.

83. Morgan Stanley also engaged in a series of fraudulent and deceitful acts or practices, including knowingly: (i) failing to disclose Morgan Stanley's significant financial interest in inducing Ashland to purchase and retain Morgan Stanley-brokered SLARS; (ii) failing to disclose the true extent to which liquidity for Morgan Stanley-brokered SLARS depended on Morgan Stanley's purchases of those securities for its own inventory; (iii) failing to disclose that the market for Morgan Stanley-brokered SLARS would collapse if Morgan Stanley stopped buying these securities for its own inventory; (iv) failing to disclose that Morgan Stanley would stop buying Morgan Stanley-brokered SLARS for its own inventory in the event that it determined that doing so would be in its own commercial best interests; (v) failing to disclose the negative impact of the collapse of the market for subprime mortgages and related securities on the liquidity of Morgan Stanley-brokered SLARS; (vi) failing to disclose that the supply of Morgan Stanley-brokered SLARS was outstripping genuine third-party demand for those securities; (vii) failing to disclose that Morgan Stanley had increased purchases of Morgan Stanley-brokered SLARS for its own inventory to prevent auction failures and conceal the loss of liquidity for those instruments; (viii) failing to disclose that liquidity for Morgan Stanley-brokered SLARS existed only as a result of a discretionary management decision to continue purchasing SLARS for its own inventories; (ix) failing to disclose that favorable credit ratings on Morgan Stanley-brokered SLARS were obtained by capping the maximum "fail" or "penalty" rates on these securities; (x) failing to disclose that higher credit ratings, FFELP guarantees and purported non-dischargeability of the underlying assets in

bankruptcy associated with SLARS did not mean that SLARS would be more liquid in the event of auction failure; and (xi) failing to disclose that Morgan Stanley was contemplating when and how to end its practice of buying unwanted ARS, including SLARS, for its own accounts, which would cause the market for Morgan Stanley-brokered SLARS to collapse, stranding investors, including Ashland, with illiquid securities.

84.    As Morgan Stanley intended, Ashland reasonably relied upon Morgan Stanley's representations in:  (i) engaging Morgan Stanley to provide investment and cash management services to the Company in or about May 2007; (ii) purchasing Morgan Stanley-brokered SLARS in and after September 2007; and (iii) retaining Morgan Stanley-brokered SLARS, and increasing purchases of Morgan Stanley-brokered SLARS, in and after September 2007.

85.    As a consequence of the foregoing, Ashland has suffered damages in an amount to be determined at trial.

## COUNT II
### (Common Law Fraud)

86.    Ashland repeats and realleges the allegations of paragraphs 1 through 85.

87.    With the intent of inducing Ashland to purchase and retain SLARS, Morgan Stanley knowingly and/or recklessly made the material misrepresentations and omissions of material facts as set forth above.

88.    The fraudulent misrepresentations made by Morgan Stanley to Ashland included Morgan Stanley's: (i) false statements that Morgan Stanley-brokered SLARS were safe, liquid, comparable to money market instruments, and suitable to the Company's conservative Investment Policy and specific liquidity needs; (ii) false statements with respect to Morgan

Stanley's willingness to place sufficient proprietary bids to prevent auction failure; (iii) false statements with respect to the nature, credit quality and risks associated with Morgan Stanley-brokered SLARS; (iv) false statements with respect to the causes of auction failures for ARS and SLARS brokered by other institutions; (v) false statements that the safety and liquidity of Morgan Stanley-brokered SLARS were not impacted negatively by the collapse of the market for subprime mortgages and related securities; (vi) false statements with respect to Morgan Stanley's intent and ability to never allow Ashland to be left holding illiquid Morgan Stanley-brokered SLARS; and (vii) false statements with respect to the higher quality and increased liquidity of SLARS compared to other ARS based on the credit ratings, FFELP guarantees and purported non-dischargeability of the underlying assets in bankruptcy associated with SLARS.

89.     Morgan Stanley's fraudulent omissions to Ashland included Morgan Stanley's: (i) failure to disclose Morgan Stanley's significant financial interest in inducing Ashland to purchase and retain Morgan Stanley-brokered SLARS; (ii) failure to disclose the true extent to which liquidity for Morgan Stanley-brokered ARS, including SLARS, depended on Morgan Stanley's purchases of those securities for its own inventories; (iii) failure to disclose that the market for Morgan Stanley-brokered ARS, including SLARS, would collapse if Morgan Stanley stopped buying these securities for its own inventories; (iv) failure to disclose that Morgan Stanley would stop buying Morgan Stanley-brokered SLARS for its own inventories in the event that Morgan Stanley determined that doing so would be in its own commercial best interests; (v) failure to disclose the negative impact of the collapse of the market for subprime mortgages and related securities on the liquidity of Morgan Stanley-brokered SLARS; (vi) failure to disclose that the supply of Morgan Stanley-brokered SLARS was outstripping genuine third-party demand for those securities; (vii) failure to disclose that the Morgan Stanley

had increased purchases of Morgan Stanley-brokered SLARS for its own inventories to prevent auction failures and conceal the loss of liquidity for those instruments; (viii) failure to disclose that liquidity for Morgan Stanley-brokered SLARS existed only as a result of discretionary management decisions by Morgan Stanley to continue purchasing ARS for its own inventories; (ix) failure to disclose that favorable credit ratings on Morgan Stanley-brokered SLARS were obtained by capping the maximum "fail" or "penalty" rates on these securities; (x) failure to disclose that higher credit ratings, FFELP guarantees and purported non-dischargeability of the underlying assets in bankruptcy associated with SLARS did not mean that SLARS would be more liquid in the event of auction failure; and (xi) failure to disclose that Morgan Stanley was contemplating when and how to end its practice of buying unwanted ARS , including SLARS, for its own accounts, which would cause the market for Morgan Stanley-brokered SLARS to collapse, stranding investors, including Ashland, with illiquid securities.

90.     Ashland justifiably relied on Morgan Stanley's misrepresentations and omissions of material facts, causing Ashland to suffer injury in an amount to be determined at trial.

91.     As a consequence of the foregoing, Ashland has suffered damages in an amount to be determined at trial.

## COUNT III
### (Promissory Estoppel)

92.     Ashland repeats and realleges the allegations of paragraphs 1 through 91.

93.     Morgan Stanley unambiguously made promises to Ashland, which included, among others: (i) the Morgan Stanley-brokered SLARS sold to Ashland were safe and liquid; (ii) Morgan Stanley would ensure the liquidity of the Morgan Stanley-brokered SLARS sold to

Ashland; and (iii) Morgan Stanley had the intent and ability to never allow Ashland to be left holding illiquid Morgan Stanley-brokered SLARS.

94.     As Morgan Stanley foresaw or should have foreseen at the time, Ashland reasonably relied upon the promises Morgan Stanley made in deciding to: (i) purchase Morgan Stanley-brokered SLARS; (ii) retain those securities; and (iii) increase their purchases of Morgan Stanley-brokered SLARS.  Ashland would never have purchased the Morgan Stanley-brokered SLARS, or retained Morgan Stanley-brokered SLARS and increased its purchases of Morgan Stanley-brokered SLARS after September 2007 had it known that Morgan Stanley would not honor its promises.

95.     As a consequence of the foregoing, Ashland has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Ashland and AshThree demand a Jury Trial on all issues and further respectfully request that the Court enter a judgment or order:

1.     directing Morgan Stanley to pay to Ashland and AshThree compensatory damages in an amount to be determined at trial;

2.     directing Morgan Stanley to pay to Ashland and AshThree consequential damages in an amount to be determined at trial;

3.     directing Morgan Stanley to pay Ashland and AshThree punitive damages in an amount to be determined at trial;

4.      directing Morgan Stanley to pay to Ashland and AshThree their costs, interest and

attorneys' fees; and

5.      granting Ashland and AshThree such other and further relief as the Court may

deem just and proper.

## TRIAL BY JURY

Trial by jury is demanded on all issues so triable.

Dated: June 11, 2009

KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP

By: _____
     Christopher P. Johnson (cjohnson@kasowitz.com)
     Charles M. Miller (cmiller@kasowitz.com)
     Joshua M. Greenblatt (jgreenblatt@kasowitz.com)

1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800

Attorneys for Ashland Inc. and AshThree LLC