UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ASHLAND INC. and ASHTHREE LLC,

                         Plaintiffs,                    09 CV 5415 (RPP)
            - against -
                                          **OPINION AND ORDER**

MORGAN STANLEY & CO., INC.,

                         Defendant.
------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

       Ashland Inc. and AshThree LLC (collectively "Ashland" or "Plaintiffs") brought

this action alleging securities fraud and related state law claims in connection with their

purchase and retention of various Auction Rate Securities ("ARS").  Morgan Stanley &

Co., Inc. ("Morgan Stanley" or "Defendant") moves this Court to dismiss the first

amended complaint ("FAC") in its entirety.


**I. Factual Allegations and Proceedings[1]**

**A. The First Amended Complaint:**

       Plaintiffs filed the FAC on September 8, 2009.  In it, they allege, "upon

knowledge as to themselves, and otherwise upon information and belief," that Morgan

Stanley made "false and misleading statements to, and material omissions from, Ashland

aimed at inducing the company to purchase student loan auction rate securities

("SLARS") from Morgan Stanley, and to hold and to continue purchasing those securities

---

[1] All facts described herein are, unless otherwise noted, as alleged in the complaint.  *See Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 555 (2007).

at a time when Morgan Stanley knew the market for those ARS was collapsing."  FAC, ¶1.

The Plaintiffs are Ashland, Inc. (incorporated and with its principal place of business in Kentucky) and AshThree LLC (created under the laws of Delaware).  *Id*. at ¶¶16-17.  Ashland Inc. is the only member of AshThree LLC.  *Id*. at ¶17.  AshThree LLC is the holder of the SLARS that are at issue in this case.  *Id*.  The Defendant is Morgan Stanley & Co., Inc. (incorporated in Delaware, with its principal place of business in New York).  *Id*. at ¶18.

ARS are securities with interest rates that are set periodically by auction.[2]  The auctions, which follow a Dutch auction format, are "typically held every 7, 14, 28, or 35 days."  *Id*. at ¶35.  At each auction, purchasers and holders can place one of four bids: buy, hold, hold-at-rate, or sell.  *Id*. at ¶36.  A bid to buy ARS will "include[] a stated rate and a quantity [the purchaser] will buy if the clearing rate is equal or greater than this stated rate."  *Id*.  A hold order allows a current holder to retain its holdings regardless of the auction's clearing rate, whereas a hold-at-rate bid will result in holdings being sold unless the clearing rate is equal to or greater than the stated rate.  *Id*.  ARS auctions are run by the "Lead Underwriters" – a group described by the FAC as "the same large financial institutions that provide the issuers of the ARS with underwriting services."  *Id*. at ¶39.  If the supply of ARS at an auction exceeds demand, the auction fails and "none of the investors holding those ARS could sell their securities, and the instruments would be illiquid until the next scheduled auction."  *Id*. at ¶41.  However, investors holding ARS

---

[2] Some ARS are comprised of preferred stock, where the dividend yields are set through periodic auctions. FAC, ¶35.  Because the ARS in this case involve long-term bonds (specifically, securities based on packaged student loans ("SLARS")), this description of ARS deals primarily with that type of ARS.

following a failed auction are entitled to a higher "penalty rate" of interest that is designed "to penalize issuers, compensate investors for the temporary illiquidity, and create new liquidity by inducing new investors to step in and purchase the ARS to benefit from the higher interest rate."  *Id.*  Bid information about ARS auctions was not publicly available.  *Id.* at ¶43.

Plaintiffs allege that Ashland's business model "requires it to keep substantial funds readily available in the form of cash or highly-liquid assets" and that this was reflected in the company's written Investment Policy, which it provides or describes "to all financial institutions with whom the company conducts investment or cash management business."  *Id.* at ¶¶21-24.  In June 2005, a sales transaction resulted in Ashland Inc. receiving $1.3 billion in cash, which it earmarked for future acquisitions ("Acquisition Principal").  *Id.* at ¶25.  Ashland Inc. transferred this $1.3 billion in cash "as capital to AshThree LLC, a special purpose entity wholly-owned and operated by Ashland Inc."  *Id.* at ¶26.  As the sole member of AshThree, Ashland Inc. made all of AshThree's investment decisions, in accordance with its Investment Policy.  *Id.*

In the spring of 2007, Ashland's broker at Merrill Lynch, Thomas Byrne, moved to Morgan Stanley.  *Id.* at ¶27.  He continued to provide investment advice to Ashland from his new position at Morgan Stanley, and he remained in "constant contact" – daily phone calls along with multiple in-person meetings each year – with Ashland's Assistant Treasurer, Joseph Broce.  *Id.*  In mid-2007, Byrne and other Morgan Stanley employees approached Ashland to propose bundled services (investments, pension, and short term cash management).  *Id.* at ¶28.  In May 2007, Broce met with Byrne to discuss investment and cash management of the Acquisition Principal; at this meeting, Broce

emphasized the need for both safety and liquidity in investing the Acquisition Principal. *Id.* at ¶29.  Morgan Stanley marketed its investment and cash management services "aggressively" and represented that Morgan Stanley could provide "high quality SLARS."  *Id.* at ¶¶30, 31.  That same month, Byrne represented to Broce that there were "no liquidity issues" with SLARS and told Broce that SLARS were "the safest thing next to U.S. Treasuries because they are backed by the U.S. government."  *Id.* at ¶32.  Broce asked if auction failures were possible; Byrne responded by dismissing this possibility and affirmatively stated that in the event of a market failure, Morgan Stanley and other brokers "would 'come in and make the market' as they had always done in the past."  *Id.* at ¶33.  Based upon these representations, "Ashland engaged Morgan Stanley to provide investment advice and cash management services to" Ashland.  *Id.* at ¶34.   From May through August 2007, Ashland used Morgan Stanley's services to purchase Treasury instruments and various types of commercial paper.  *Id.* at ¶45.

In August 2007, Byrne advised Broce by telephone and email that Ashland should be placing its cash into "taxable auction rate securities positions," which he represented would best protect Ashland's assets "from the growing crisis in subprime mortgages." *Id.* at ¶46.  Byrne represented repeatedly that instability and ARS market failures were rare and that Morgan Stanley would not allow an auction to fail.  *Id.* at ¶51.  Byrne emphasized that the SLARS tended to carry AAA ratings from the ratings agencies and that the student loans involved in the ARS were "backed by the United States government" and were not dischargeable in bankruptcy.  *Id.* at ¶52.  Byrne also repeatedly represented to Broce, in August 2007, that no SLARS auction had ever failed. *Id.* at ¶56.

The FAC makes a number of conclusory allegations about the ARS practices of brokers, and, in particular, Morgan Stanley.  *Id*. at ¶¶35-44.  Of note to this motion, the FAC alleges that "[t]he Lead Underwriters were . . . propping up an artificial market in ARS [by placing proprietary bids for large numbers of ARS] while leading investors like Ashland to believe that the market functioned with little or no intervention from the Lead Underwriters."  *Id*. at ¶42.

The FAC also alleges that "[e]ach of Byrne's and Morgan Stanley's statements regarding the liquidity of Morgan Stanley -brokered SLARS was false and misleading at the time it was made because, contrary, to Morgan Stanley's misrepresentations, the continued 'liquidity' of Morgan Stanley -brokered SLARS was, as Morgan Stanley knew, unrelated to the underlying FFELP[3] -backed loans, AAA ratings or purported isolation from the subprime mortgage market."  *Id*. at ¶58.  Instead, the FAC alleges that the much-touted liquidity "depended solely on Morgan Stanley's continuing purchases of those securities because third party demand had already dried up."  *Id*.  Additionally, the FAC alleges that Morgan Stanley concealed from Ashland that: "(i) Morgan Stanley's 'market making' activities were essential to avoiding total illiquidity of those Morgan-Stanley brokered ARS; (ii) the financial burden upon Morgan Stanley from its SLARS 'market making' activities was increasing dramatically due to the rapid deterioration of investor demand for Morgan Stanley-brokered SLARS. . . ; and (iii) Morgan Stanley would not continue its purchases indefinitely and knew it would, contrary to its representations, leave Ashland stranded with Morgan Stanley-brokered ARS when it determined that

---

[3] FFELP refers to the federal program that guarantees student loans.

purchasing those securities [to prop up the market] was no longer in its own interests." *Id*. at ¶59.

On September 25, 2007, in reliance on these representations and omissions, Ashland began purchasing Morgan Stanley-brokered SLARS. *Id*. at ¶49. In the months leading up to this purchase and at the time of the above misrepresentations and omissions, Morgan Stanley frequently had to make a market for otherwise illiquid ARS. *Id.* at ¶75. Ashland purchased SLARS from Morgan Stanley on two additional dates: October 2, 2007 and November 29, 2007. *Id*. at ¶¶ 61-63.

After Ashland's first purchase of the SLARS, Byrne and another broker at Morgan continued to make representations to Ashland about the strength of SLARS. *Id.* at ¶64. For instance, on December 11, 2007, Byrne represented to Ashland that the AAA ratings and the U.S. government guarantee of student loans made SLARS "one of the strongest backings in the asset-backed market." *Id*. at ¶53.

The FAC alleges that during this period Morgan Stanley failed to disclose that the high AAA ratings actually had an adverse effect on liquidity, contrary to Morgan Stanley's representations, and that this was known to Morgan Stanley. *Id*. at ¶¶69-70. More generally, the FAC alleges that "Morgan Stanley was aware of auction failures and significant disruptions in the ARS market," that Morgan Stanley was aware that the ARS market was closely linked to the subprime crisis, at least as early as August 2007 when "at least 96 auctions for ARS. . . failed," and Byrne's failure to disclose "that Morgan Stanley routinely had to rescue auctions and that the liquidity he touted was false and artificial" caused Ashland to hold its SLARS, rather than sell the SLARS. *Id*. at ¶¶64, 73, 75.

The FAC alleges that "Ashland was not provided with a prospectus for any of the SLARS sold to it by Morgan Stanley until <u>after</u> the auctions had concluded." *Id*. at ¶66 (emphasis in original).  Later in the FAC, there is an allegation that "Morgan Stanley had imposed a limit on the number of SLARS it would purchase for its own inventory." *Id*. at ¶71.  The FAC also alleges that Morgan Stanley did not disclose its own financial interest in maintaining the market for SLARS or the interest of its financial advisors, such as Byrne, in selling SLARS "rather than *bona fide* cash management instruments." *Id*. at ¶72.

In December 2007, Ashland learned of a failed SLARS auction (underwritten by Goldman Sachs, and not involving SLARS owned by Ashland).  *Id*. at ¶83.  Broce contacted Byrne to discuss how this would affect the SLARS issued by Morgan Stanley; Byrne's response (quoted in the complaint) depicted the Goldman Sachs SLARS as completely different from those brokered by Morgan Stanley and used this to attempt to sell more SLARS to Ashland.  *Id*. at ¶¶83-85.  The FAC alleges that another ARS auction failed on January 23, 2008, which was not disclosed to Ashland, even as Morgan Stanley continued to recommend that Ashland purchase additional SLARS.  *Id*. at ¶88.  The FAC alleges that Byrne and his co-worker, Susan Resnik, contacted Ashland by email at least fifty times from August 2007 through February 2008 "in an effort to market Morgan Stanley-backed SLARS." *Id*. at ¶89.

"As the implosion of the ARS market unfolded, Ashland directed Morgan Stanley to begin liquidating its holdings of Morgan Stanley-brokered SLARS." *Id*. at ¶91.  Byrne told Broce that Morgan Stanley could not and would not provide or ensure liquidity for any Morgan Stanley ordered SLARS held by Ashland.  Thereafter, Ashland discovered

that its SLARS were illiquid.  *Id*. at ¶¶91-92.  As of February 12, 2008, Ashland was "trapped with over $66 million of illiquid Morgan Stanley-brokered SLARS."  *Id*. at ¶92.

The FAC alleges that Morgan Stanley's actions have injured Ashland/AshThree: (1) "Morgan Stanley has steadfastly refused to provide any liquidity" for the SLARS held by Ashland; (2) "Ashland has already been forced to mark the value of its illiquid Morgan Stanley-brokered SLARS holdings down by millions of dollars"; and (3) the fact that the Acquisition Principal is tied up in these illiquid holdings meant that Ashland was "forced to borrow funds" to complete a long-sought acquisition of a specialty chemical company (Hercules, Inc.), thus incurring "millions of dollars in costs and fees associated with being forced to borrow funds."  *Id*. at ¶¶94-96.

## B. Defendant's Submissions

Morgan Stanley placed a statement of its ARS policies and practices online, "as a result of an Order entered into between the SEC and certain active broker-dealers in the auction rate securities market [on May 31, 2006]," and its clients were advised of this statement in trade confirmations.[4]  Exh. B. to Musoff Decl.; Tr. 6.  Morgan Stanley's statement provides an overview of the ARS market and describes the role of broker-dealers, like Morgan Stanley, in the ARS auctions.  Exh. B. to Musoff Decl.

The document advises that "Morgan Stanley is permitted, but not obligated, to submit orders in auctions for its own account either as a bidder or a seller and routinely does so at its own discretion."  *Id*. at 3.  Similarly, the document advises: "Morgan

---

[4] Where, as here, public documents filed with the SEC are attached to a defendant's motion to dismiss, the Court may consider them without converting a motion to dismiss into a summary judgment motion. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[I]t is highly impractical and inconsistent with Fed. R. Evid. 201 to preclude a district court from considering such documents when faced with a motion to dismiss a securities action based on allegations of material misrepresentations or omissions.").

Stanley routinely places one or more bids in an auction for its own account to acquire ARS for its inventory, to prevent a failed auction or to prevent an auction from clearing at a rate that Morgan Stanley believes is higher than the market for similar securities at the time it makes its bid." *Id.* It also warns of the illiquidity danger to an investor in a failed auction, namely that the "holders may be disadvantaged if there is a failed auction because they are not able to exit their position through the auction" and that "[b]ids by Morgan Stanley are likely to reflect (i) the rate on ARS – including preventing the rate from becoming the Maximum Rate or otherwise causing bidders to receive a higher or lower rate than they might have received had Morgan Stanley not bid and (ii) the allocation of ARS being auction – including displacing some bidders who may have had their bids rejected or receive fewer ARS than they would have received if Morgan Stanley had not bid." *Id*. at 4. The statement warned that, for these reasons: "the fact that an auction clears successfully does not mean that an investment in the ARS involves no significant liquidity or credit risk. Morgan Stanley is not obligated to bid in any auction to prevent an auction from failing or clearing at an off-market rate. Investors should not assume that Morgan Stanley will do so." *Id.* at 4. The document also included the disclaimer that "Morgan Stanley provides no assurance as to the outcome of any auction," and that "[t]here can be no assurance that a secondary market for these securities will develop or, if it does develop, that it will provide holders the ability to resell auction securities in the secondary market on the terms or at the times desired by a holder." *Id*. at 6-7.

     Morgan Stanley also filed a copy of the prospectus for Ashland's first purchased SLARS, securitized bonds issued by the Pennsylvania Higher Education Assistance

Agency, issued on May 9, 2006.  Exh. C to Musoff Decl.  The prospectus contains the same warnings about the SLARS securities as contained in the Morgan Stanley statement of ARS practices and procedures.

Additionally, Morgan Stanley has filed with this Court an amended complaint filed by Ashland in another case, *Ashland Inc. and AshThree LLC v. Oppenheimer & Co., Inc.*, which was filed in the Eastern District of Kentucky.[5]  Exh. D to Musoff Decl.  The Complaint in that case alleged that Oppenheimer made fraudulent misrepresentations, causing Ashland to invest $194 million in Oppenheimer-brokered ARS, beginning on June 5, 2007, and Oppenheimer-brokered SLARS, beginning on July 17, 2007.  Complaint at ¶¶28, 45, *Ashland Inc. and AshThree LLC v. Oppenheimer & Co., Inc.*, No. 09-cv-135, 2010 WL 672106 (E.D.Ky. Feb. 22, 2010).  The Complaint further alleges that those SLARS became illiquid at the same time as the SLARS in the instant case.  *Id.* at ¶¶78-80.

**C. Plaintiff's Admissions in Memorandum of Law and at Oral Argument**

In their memorandum of law opposing the motion to dismiss, Plaintiffs concede receipt of Morgan Stanley's written disclosures.  Pl. Mem. at 31 ("Despite its knowledge of disclosures outlining the general risk of auction failures, Ashland had no reason to believe that Morgan Stanley was lying when it promised to ensure liquidity. . .").  At oral argument, Plaintiffs confirmed that they had received Morgan Stanley's written statement of ARS practices after their first purchase of stock but before subsequent auctions in

---

[5] The Court may take judicial notice of filings in other courts, "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."  *Kramer*, 937 F.2d at 774.

which they decided to place "hold" orders (and before their additional purchases of SLARS at subsequent auctions).  Tr. 29.

Also at oral argument, counsel for Plaintiffs conceded that they were sophisticated investors and that Ashland Inc. had an investment committee tasked with making decisions about the company's investments.  Tr. 25-26.  They confirmed that AshThree purchased and held the securities, but that Ashland made all decisions directing investments.  Tr. 33.  Finally, counsel for Plaintiffs conceded at oral argument that the auctions in this case occurred "in New York" and "that the mechanics of the transaction get routed through New York."  Tr. 43, 44.

**D. Claims for Relief**

The FAC puts forth several claims for relief: (1) fraud, violating §10(b) of the Securities and Exchange Act of 1934 and subsequently promulgated Rule 10b-5; (2) common law fraud; (3) promissory estoppel; (4) breach of fiduciary duty; (5) negligence; (6) negligent misrepresentation; and (7) unjust enrichment.  The FAC prays for the following relief: (1) compensatory damages; (2) consequential damages; (3) disgorgement of fees; (4) punitive damages; (5) rescission of the purchase of SLARS, with full interest; (6) costs and fees; and (7) further appropriate relief.

**E. Motion to Dismiss**

Defendant now moves to dismiss the FAC "pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and Section 21D(b) of the Securities Exchange Act of 1934 (the 'Exchange Act'), 15 U.S.C. §78u-4(b) (added by Section 101(b) of the Private Securities Litigation Reform Act of 1995 (the 'PSLRA'))."  Def.'s Mem., 1.  Defendant's Motion argues that each of the claims for relief made in the FAC should be dismissed.

## II. Background of Federal Securities Law Claim

## A. Applicable Law

In order to make out a Section 10(b) and Rule 10b-5 claim, the Plaintiffs "must establish that 'the defendant, in connection with the purchase or sale of securities, made a materially false statement of a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff.'" *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)). Because certain alleged misrepresentations were made after the purchase of securities, and therefore not "in connection with the purchase or sale of securities," the Court concludes that those misrepresentations are not actionable.

A plaintiff alleging securities fraud and related causes of action must meet a heightened pleading standard in order to survive a defendant's motion to dismiss. The Private Securities Litigation Reform Act (PSLRA) was enacted "[a]s a check against abusive litigation by private parties." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 515 U.S. 308, 313 (2007). The PSLRA requires a plaintiff who alleges securities fraud based on a misrepresentation or omission of material fact to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading. . . ." 15 U.S.C. § 78u-4(b)(1). The PSLRA also requires that in any securities fraud action "the complaint shall, with respect to each act or omission alleged to violate [the Securities Exchange Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

In addition to the pleading requirements of the PSLRA, Federal Rule of Civil Procedure 9(b) applies to any claim sounding in fraud. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). Rule 9(b) provides that "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud." The Second Circuit "has read Rule 9(b) to require that a complaint '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Rombach*, 355 F.3d at 170.

Finally, all pleadings must conform with the Supreme Court's holding in *Ashcroft v. Iqbal*: "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (3007)). In *Iqbal*, the Supreme Court explained, "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (citations omitted).

## B. Fraudulent Misrepresentations or Omissions

"The materiality of a misstatement depends on whether 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'" *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)). An omission is material "whenever secret information renders prior public statements materially misleading." *In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 268

(2d Cir. 1993).  Statements of puffery or mere generalizations are inactionable under the securities laws.  *Id*. at 206.  Opinions are generally not actionable, but they may be the basis of a Section 10(b) or Rule 10b-5 claim "if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them."  *In re Int'l Bus. Mach. Corp. Secs. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (citations omitted).

In their briefing on this Motion, Plaintiffs have argued that the misrepresentations and omission alleged in the FAC generally fell into seven or eight categories.  Pl. Mem. at 11.

The first allegation is that "in or around August 2007" Byrne represented to Broce in August 2007 that "SLARS . . . enjoyed reliable demand and liquidity due to their high quality, . . . were based on the highest-quality student loans backed by the United States government, . . . and were based on assets – student loans – that were not dischargeable in bankruptcy under the Federal Bankruptcy Code."  *Id*. at ¶¶32, 52.  The FAC alleges the speaker and place with particularity and states that this is a misrepresentation, because the demand for the SLARS was not reliable.[6]  *Id*. at ¶68.

The second allegation is that Byrne represented to Ashland/Ashthree that the subprime mortgage crisis had no bearing on the market for SLARS.  The FAC alleges

---

[6] The date "in or around August 2007" may not be sufficiently particular or sufficiently close to the Plaintiff's purchase of SLARS on September 25, 2007, but because this claim is dismissed on other grounds, the Court need not decide whether this statement is sufficient to meet the heightened pleading standards of  Rule 9(b).

The FAC also alleges that similar statements were made later, on the days of auctions at which Ashland purchased SLARS (September 25, October 2, and November 29 of 2007).  *Id*. at ¶¶61-64, 87.  These statements are treated as a separate category in the Plaintiffs' briefings (cf. misrepresentation #1 with misrepresentation # 7 in Pl. Mem. at 11), but because the alleged misrepresentations are similar, if not identical, the Court treats these allegations as constituting one category of misrepresentation.

that in at least two telephone conversations in or around August 2007 and an email sent on August 31, 2007, Byrne emphasized that the SLARS was not connected in any way in the subprime crisis. *Id.* at ¶¶46-48. The FAC alleges the time, place, and speaker of these statements with sufficient particularity and states that the subprime mortgage crisis had effects on the ARS market generally, and on the SLARS market. *Id.* at ¶73.

The third allegation contained in the FAC is that Byrne misrepresented that the high credit ratings of SLARS should be equated with reliable liquidity. *Id.* at ¶¶52, 58, 59, 69. Specifically, the FAC alleges that: (1) Byrne told Broce by telephone in August 2007 that SLARS were AAA rated and represented this "as evidence of the safety and liquidity of the instruments"; (2) this statement was allegedly "false and misleading at the time it was made because" Morgan Stanley knew that liquidity depended instead upon Morgan Stanley's intervention in the auctions; and (3) it was allegedly false because the high credit rating lessened liquidity because the high credit rating were achieved by instituting "low maximum fail rates" – i.e. rates that ensure that security holders receive interest and principal when it is due – which are less attractive to investors. *Id.* at ¶¶52, 58, 69. As with alleged misrepresentations 2 and 3, the FAC alleges place and person with sufficient specificity.[7] Whether high credit ratings lessened the liquidity of the SLARS or were achieved by low maximum fail rates are issues of fact that cannot be decided at this stage.

The fourth allegation contained in the FAC is that Byrne misrepresented to Broce that in the event of a potential auction failure, Morgan Stanley would intervene and

---

[7] The Court again declines to decide whether "in or around August 2007" is a sufficient statement of timing under Rule 9(b) or is sufficiently close to the purchase date for Plaintiffs to have relied upon it.

"make the market," thus ensuring liquidity. *Id*. at ¶¶7, 33, 51, 56-57. The FAC alleges that these representations were made repeatedly in August 2007. *Id*. at ¶¶33, 51, 56-57. The FAC states that the fourth misrepresentation was false, because "Morgan Stanley would not continue its purchases indefinitely and knew it would, contrary to its representations, leave Ashland stranded with Morgan Stanley-brokered ARS when it determined that purchasing those securities was no longer in its interests." *Id*. at ¶¶59, 71. Thus, the FAC alleges with sufficient specificity and speaker and place of the statement and states why the representation was false.[8]

The fifth allegation is that the Morgan Stanley failed to disclose that SLARS' liquidity depended solely on Morgan Stanley's continued intervention in the auctions.[9] FAC, ¶¶9, 58-59, 61-64, 68, 92.

The sixth allegation contained in the FAC is that Morgan Stanley withheld from Ashland information about investor demand, the frequency with which Morgan Stanley had to rescue auctions, and the stake accumulated by Morgan Stanley in its purchases of SLARS. FAC, ¶¶42-43, 61-64, 76. The FAC alleges that this omission occurred during

---

[8] Statements, like this one, which are promises of future action are generally not actionable if they "lack the sort of definite positive projections that might require later correction." *In re Time Warner Inc. Secs. Litig.*, 9 F.3d at 267. The Defendant's generalized promise to intervene and "make the market" in the event of auction failure does not go beyond the promises and puffery that accompany many deals. Plaintiffs do not allege that Morgan Stanley provided any specific details about any future intervention in the ARS auctions, such as how much would Morgan Stanley willingly expend to "make the market," and how exactly would Morgan Stanley "make the market." This promise lacks "definite positive projections" that would require Morgan Stanley to subsequently correct the statement when Morgan Stanley became aware that it would not be "making the market" after a certain date. Moreover, as with the above statements, "in or around August 2007" is likely not sufficiently specific under Rule 9(b).

Because, however, this claim is dismissed on other grounds, the Court need not decide whether this statement is sufficient to meet the heightened pleading standards of Rule 9(b) or whether it is an actionable promise of future action.

[9] Although this is framed as an omission in the FAC, it is much more akin to a misrepresentation – i.e. Defendants told Plaintiffs that the SLARS were liquid and that there was demand, when what they should have said was that bids were only sufficient to meet offers to sell due to Morgan Stanley's intervention in the SLARS market. This is also true of the sixth allegation, as described below.

August 2007 and on September 25, 2007, October 2, 2007, and November 29, 2007,

when Byrne was actively inducing Broce to purchase SLARS brokered by Morgan

Stanley.  This allegation meets the date, place, and speaker requirements of Rule 9(b).

The final allegation in the FAC is that Byrne, in response to an inquiry from

Broce about a December 2007 auction failure in a Goldman-issued SLARS,

misrepresented that auction as an "aberration" and attributed the failure to the fact that

the auction involved loans not guaranteed by the federal government.  *Id*. at ¶¶83-85.

The FAC alleges the speaker, place, and time of the alleged misrepresentation with

specificity (Byrne, by email, on December 11, 2007).  *Id*. at ¶84.


## III. Discussion

## A. Introduction

The Court concludes, for the reasons discussed herein, that the claims contained

in the FAC, stripped of its conclusory allegations and allegations failing to meet the

standards of Rule 9(b) and the PSLRA as discussed above, fail to state a claim upon

which relief can be granted.  While the FAC alleges misrepresentations and omissions

that may be material, the Plaintiffs' claim of securities fraud fails because: (1) certain

allegations do not involve the "purchase or sale of securities," inasmuch as they allege

that Defendant fraudulently induced Plaintiffs to hold securities; (2) the FAC does not

allege facts that support a strong inference of scienter as to any of the alleged

misrepresentations or omissions; and (3) the FAC does not allege facts showing that the

Plaintiffs were reasonable in their reliance on any of the alleged misrepresentations when

making their decision to purchase SLARS. The Plaintiffs' claims of common law fraud

17

and promissory estoppel likewise fail because the Plaintiff's reliance upon Byrne's vague and general statements cannot be said to be reasonable.  The remaining claims are preempted by New York's Martin Act.

**B. Count I: Fraud in Violation of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder**

### 1. Allegations not in connection with purchase or sale of securities

As a preliminary matter, Defendant, citing *Blue Chip Stamps v. Manor Stores*, contends that "Ashland Inc. did not purchase any SLARS and thus cannot assert a securities fraud claim."  Def. Mot., 10.  Plaintiffs concede that AshThree, rather than Ashland Inc., purchased and held the securities at issue.  Pl. Mem., 10.  However, they argue that Defendant's argument is based on an overly technical reading of the statute and is not supported by the caselaw.  *Id*.

In *Blue Chip Stamps v. Manor Stores*, the Supreme Court adopted the *Birnbaum* rule to determine whether a plaintiff had standing in cases brought pursuant to Section 10(b) and Rule 10b-5 and held that "the plaintiff class in a Rule 10b-5 action was limited to actual purchasers and sellers."  421 U.S. 723, 731 (1975) (citing *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461, 463-64 (2d Cir. 1952)).  The plaintiffs in *Blue Chip* were non-shareholders who, pursuant to a consent degree, were offered shares of common stock by Blue Chip Stamps; the plaintiff class alleged that Blue Chip Stamps had distributed a prospectus (in connection with the offering) that "was materially misleading in its overly pessimistic appraisal of Blue Chip's status and future prospects," thus causing plaintiffs not to purchase Blue Chip Stamps common stock.  *Id*. at 726.  In determining that the plaintiffs did not have status to bring suit under Section 10(b) and Rule 10b-5, the Supreme Court noted that the *Birnbaum* rule, which it adopted, had the effect of barring

three classes of plaintiffs: (1) "potential purchasers of shares"; (2) "actual shareholders in the issuer who allege that they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material which made the issuer appear to be a less favorable investment vehicle than it actually was"; and (3) "shareholders, creditors, and perhaps others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b-5." *Id.* at 737-38.

In spite of the *Blue Chip Stamps* rule limiting plaintiffs to those who actually purchased or sold a security, courts have concluded that, where an individual or company creates an entity to act as intermediary for investment purposes and where that intermediary is effectively an alter ego of the plaintiff, the plaintiff will have standing.[10] The Defendant does not contend that AshThree was not under the complete control of Ashland Inc.  Nor does the Defendant contend that AshThree had any purpose other than to act as an investment intermediary.  Instead, it appears that AshThree was effectively a subdivision or alter-ego of Ashland used for the sole purpose of facilitating investments.  On this limited record, Ashland has standing.

Nevertheless, certain allegations in the FAC are barred by the holding of *Blue Chip Stamps*.  All allegations relating to misrepresentations that induced Ashland to "continue[] to place 'hold' and 'hold-at-rate' orders, rather than 'sell' orders," FAC, ¶64, cannot constitute fraud since they do not concern a purchase or sale and, under long-

---

[10] In *Abbey v. 3F Therapeutics, Inc.*, Judge Wood in this District provided a thorough overview of the cases concluding that when this sort of investment intermediary purchases the stock on behalf of the individual or company controlling the intermediary, the individual or company in control retains standing to bring a Section 10(b) claim.  2009 WL 4333819, at *5-*8 (S.D.N.Y. Dec. 2, 2009).

standing Supreme Court precedent, such statements are thus not actionable under federal securities laws. *Blue Chip Stamps*, 421 U.S. at 737-38 (holding that "actual shareholders in the issuer who allege that they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material which made the issuer appear to be a less favorable investment vehicle than it actually was" do not have standing under the securities laws). At oral argument, Plaintiffs argued that the securities laws did not "contemplate" this type of auction rate security and thus should not be held to bar fraud claims based on misrepresentations aimed at inducing a holder not to sell its ARS. Tr. 30. Plaintiffs cite no authority for this proposition, and have not argued that ARS fall outside the purview of the federal securities laws (nor could they do so, as they have brought this action pursuant to those laws). Any statements, therefore, aimed at inducing Ashland to hold its SLARS position are not actionable misrepresentations under the Securities Exchange Act. *Blue Chip Stamps*, 421 U.S. at 737-38. Consequently, any statements made after the Plaintiffs' last purchase of SLARS, on November 29, 2007, are not actionable misrepresentations. The final alleged fraudulent omission, concerning misstatements in December 2007, occurred long after Ashland's final purchase of SLARS and is, thus, not actionable.[11] *Id.*

### 2. Scienter

_____

[11] Additionally, that misrepresentation is likely not actionable because the FAC does not explain why the statement is misleading, as it is required to do under both Rule 9(b) and the PSLRA, if it is to survive a motion to dismiss. The FAC alleges that Byrne should have advised Broce that a federal guarantee of the underlying loan was not a guarantee of auction success, which may be true. But, the FAC does not allege that, as to the particular auction failure that was the subject of the December 11 email, any of the statements about the cause of the auction failure were false. It does not allege that that particular auction failure was not caused by the fact that the underlying loans were not federally guaranteed; nor does it allege that, at the time Byrne's email was written, many other auctions failed, so that the Goldman auction failure would not be an aberration.

Under the PSLRA, a complaint must plead scienter, by "stat[ing] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. 78u-4(b)(2).  In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the Supreme Court explained that this language should be understood to mean that "an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  551 U.S. 308, 314 (2007).  The complaint must state "facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness," if it is to meet the heightened pleading standards for scienter.  *ECA & Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 198.

To establish the strong inference of scienter through the motive and opportunity prong, a complaint "must allege that [the defendant] or its officers 'benefited in some concrete and personal way from the purported fraud.'  Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  *Id*. (quoting *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)).  To establish the strong inference of scienter through the circumstantial evidence prong, the Second Circuit has held that any one of the following four allegations will generally suffice to give rise to a strong inference of scienter under the second prong: (1) that the defendants "benefited in a concrete and personal way from the purported fraud," (2) that the defendants "engaged in deliberately illegal behavior," (3) that the defendants "knew facts or had access to information suggesting that their

public statements were not accurate," or (4) that the defendants "failed to check information they had a duty to monitor." *Id*. at 199 (quoting *Novak*, 216 F.3d at 311). "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309.

As to motive and opportunity: the Plaintiffs' opposition to the motion to dismiss argues that the FAC alleges that Morgan Stanley made the misrepresentations so that it could "keep the market afloat long enough to permit Morgan Stanley to exit," i.e. that the defendants were engaged in a Ponzi-type scheme. Pl. Mem., 16. This would be likely adequate motive to establish a strong inference of scienter, if the FAC alleged facts supporting this assertion. However, the FAC does not allege any facts tending to show that Morgan Stanley had that motive. The closest the FAC comes to alleging facts showing Morgan Stanley's Ponzi-type motivation described in its briefing is its allegations that Ashland's ability to sell the Morgan Stanley brokered SLARS and recover its cash depended solely on Morgan Stanley's continuing purchase of the securities because third party demand had dried up and that "Morgan Stanley would not continue its purchases indefinitely and knew it would, contrary to its representations, leave Ashland stranded with Morgan Stanley-brokered ARS when it determined that purchasing those securities was no longer in its own interests." FAC, ¶45, 59. While Plaintiffs have described this motivation more thoroughly in their briefing opposing the motion to dismiss, in the FAC, they fail to allege facts with any level of particularity that actually support this ascribed motivation. This failure to allege facts showing that Morgan Stanley hoped to induce Ashland to purchase SLARS in the auctions to increase or sustain demand for SLARS so that Morgan Stanley could sell off its own SLARS

22

holdings is fatal to the FAC. *Novak*, 216 F.3d at 309. Even assuming that the FAC had alleged facts supporting this theory of the case, those allegations would be economically irrational. For Morgan Stanley to purchase billions of dollars in auctions of SLARS in order to induce Ashland into an already illiquid auction market would leave Morgan Stanley in an illiquid position also. Absent a more coherent motivation, the FAC contains no factual allegations supporting any inference, let alone a strong inference, of scienter.

As to circumstantial evidence: the Plaintiffs' brief in opposition points to multiple allegations in the FAC purporting to show that defendant "knew facts or had access to information suggesting that their public statements were not accurate." *ECA & Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 199. To survive a motion to dismiss where scienter is premised on circumstantial allegations, a complaint must "specifically identify the reports or statements containing" information that was known to defendant and that contradicted defendant's statements to plaintiff. *Novak*, 216 F.3d at 309. This standard requires specific allegations that show the Defendants' knowledge of information contradicting their statements, and the FAC does not meet this high standard. The FAC makes repeated allegations that Morgan Stanley was aware that the SLARS it marketed to Ashland were likely to become illiquid. *E.g.*, FAC, ¶14, 48. However, these allegations are conclusory and do not contain the factual specificity required under the PSLRA. For instance: "For more than six months prior to this collapse, Morgan Stanley was well aware that investors' ability to sell Morgan Stanley-brokered ARS and recover their cash depended largely on Morgan Stanley's continuing purchases and that those ARS would become completely illiquid as soon as Morgan Stanley stopped buying

them." *Id*. at ¶14.  In the absence of more specific allegations of "reports or statements" that demonstrate Morgan Stanley's knowledge of facts contradicting statements made by Morgan Stanley to Ashland, the FAC fails to meet the standard for pleading scienter.

### 3. Reliance

A plaintiff alleging fraud in violation of § 10(b) of the Securities Exchange Act, or Rule 10b-5 promulgated thereunder, must plead, *inter alia*, "that the plaintiff's reliance on defendant's action caused plaintiff injury."  *Starr v. Georgeson Shareholder, Inc.*, 412 F.3d 103, 109 (2d Cir. 2005).   The Second Circuit has held that, as to the element of reliance, "[a]n investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth."  *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993).  Where the investor knows that he or she is in a position to acquire additional information, but does not inquire, the Second Circuit has found that the duty to exercise "minimal diligence" renders the investor's reliance unreasonable.[12]  *Starr*, 412 F.3d at 109-10.

The FAC alleges that much of the information regarding the SLARS market (and Morgan Stanley's role therein) was non-public.  FAC, ¶9, 12, 13, 43, 44, 48, 76, 77.  In their opposition to this motion, Plaintiffs argue that "Morgan Stanley knew it was Ashland's sole source of information concerning SLARS," and therefore that it was reasonable for Ashland to rely upon the alleged Morgan Stanley's representations.  Pl. Opp., 21.  Many of Morgan Stanley's alleged misrepresentations involve vague promises of future action, e.g. Morgan Stanley will "make the market," or vague, placatory

---

[12] Where claims "primarily" involve a fraudulent omission, rather than a misrepresentation, "positive proof of reliance is not a prerequisite to recovery."  *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

statements, e.g. the subprime mortgage crisis has no bearing on the SLARS market. None of Morgan Stanley's misstatements, which Plaintiffs allege caused them to purchase SLARS, concern current happenings in the SLARS market, which the FAC alleges would have been non-public information.  Instead, these are statements about financial causation and about the way various elements of the securities markets interact, e.g. the AAA rating lowered the SLARS' liquidity because they necessitated lower fail rates.  The crux of the matter, then, is whether it was reasonable for Ashland to rely upon Morgan Stanley's fairly general analyses of the SLARS market, along with vague conclusory promises of creditworthiness and liquidity, without doing its own research and analysis of the nature of the securities involved, the manner in which the auctions operated, and the risks involved,

While many aspects of the SLARS market were non-public, the FAC does not allege that all information about the structure of SLARS and the auctions was non-public. *See Id*. at ¶9, 12, 13, 43, 44, 48, 76, 77.  Rather, it only alleges that current information about demand for SLARS and the health of the markets was non-public.  *Id*.  On this basis, the FAC provides no reason to believe that the information about SLARS markets was so closely kept that Plaintiffs could not access general information about the structure of the SLARS that would have enabled the Plaintiffs to evaluate the relationship between the SLARS and the U.S. government guarantee of student loans, the subprime crisis, and the credit ratings for SLARS.

Plaintiff Ashland Inc. "is a leading diversified global chemical company" with "sales and operations in the United States and over 100 countries around the globe" and with "approximately 15,000" employees.  FAC, ¶16.  In addition to its regular investment

portfolio, Plaintiffs were investing $1.6 billion from a sale of assets and, by their own admission, invested over $66 million in SLARS with Morgan Stanley during a two month period.[13]  *Id*. at ¶92.  At oral argument, Plaintiffs conceded that Ashland is a sophisticated investor with an investment committee whose primary function was to make formal decisions about investments.  Tr. 25.  However, Plaintiffs failed to suggest at oral argument or in the FAC that Broce or the investment committee conducted any research or investigation into these investments or the nature of the market they were entering, how it might be connected to the subprime mortgage crisis as of August 2007, and how SLARS differed from purchases of short-term investments.  Tr. 25-26.  Instead, Plaintiffs claim to have relied primarily, perhaps solely, upon general oral statements from Byrne to Broce.  *Id*.  Indeed, Plaintiffs argued that they did not receive Morgan Stanley's statement of ARS practices and policies or the prospectus (which was printed in 2006) until after their first purchase of the SLARS.[14]  Pl. Mem. at 31; Tr. 29.

As a sophisticated institution contemplating the investment of tens of millions of dollars, it was unreasonable for Ashland to rely upon the highly general statements alleged as misstatements in this case.  Moreover, it was unreasonable, perhaps reckless, for that company to not insist upon receiving, in writing, the prospectus issued in May 2006 and terms of purchase before making its initial investment of thirty million dollars

---

[13] And, as noted above, Plaintiffs also bought $194 million in SLARS from another broker, Oppenheimer & Co.  Complaint at ¶¶78-80, *Ashland Inc. and AshThree LLC v. Oppenheimer & Co., Inc.*, No. 09-cv-135, 2010 WL 672106 (E.D.Ky. Feb. 22, 2010).

[14] It is worth noting that, if the Plaintiffs had conducted basic diligence and obtained the relevant prospectuses and the Morgan Stanley statement of ARS practices and policies prior to investing tens of millions of dollars in a complicated investment vehicle with which they were unfamiliar, they would likely be prevented from recovering under the bespeaks caution doctrine, inasmuch as " '[l]iability may not be imposed based on statements that, considered in their entirety, clearly 'bespeak caution.' "  *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 811 (2d Cir. 1996).

on September 25, 2007. *See Starr*, 412 F.3d at 109-10. For a company that invested well over sixty million dollars in a two-month period in a complicated investment vehicle to rely upon the broker's general statement that, for example, the investment was "unrelated to current problems" is fundamentally unreasonable. The Second Circuit has found that investors must exercise minimal diligence for reliance to be said to be reasonable. *Brown,* 991 F.2d at1032. Here, there is no allegation that Plaintiffs exercised any diligence. Therefore, the Plaintiffs, as sophisticated investors, are barred from recovery because their reliance upon alleged misrepresentations, in the absence of performing any diligence, prior to investing tens of millions of dollars was unreasonable.

Because the Plaintiffs have failed to meet the heightened pleading standards for scienter and because the FAC does not show that Plaintiffs' reliance upon Morgan Stanley's highly general statements was unreasonable, Plaintiffs' 10(b) claim is dismissed without prejudice.

**C. Count II: Common Law Fraud**

The four elements of common law fraud in New York are: (1) a factual misrepresentation or an omission that is factual; (2) defendant's knowledge that the statement or omission was false; (3) defendant's intent to defraud; (4) plaintiff's reasonable reliance; and (5) causation of loss to the plaintiff. *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006). The elements of common law fraud are much the same as the elements of a claim of securities fraud in violation of Section 10(b) of the Securities Exchange Act. *See, e.g.*, *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F.Supp.2d 385, 407 (S.D.N.Y. 2005) ("The elements of common law fraud thus are largely the same as those of a Rule 10b-5 claim except that there is no requirement

that the fraud be 'in connection with the purchase or sale of securities.'").  In particular,

the element of reasonable reliance is much the same in New York common law as in

federal securities law.  *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc*.,

343 F.3d 189, 195 (2d Cir. 2003).  For the same reasons articulated above, the FAC fails

to properly allege a factual misrepresentation upon which the Plaintiffs reasonably relied.

Additionally, the FAC fails to plead with sufficient specificity factual allegations that

tend to show the Defendant's knowledge that the statement was false at the time it was

made and the Defendant's intent to defraud. Count II is dismissed with prejudice.

**D. Count III: Promissory Estoppel**

"A cause of action for promissory estoppel under New York law requires the

plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and

foreseeable reliance on that promise; and 3) injury to the relying party as a result of the

reliance." *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000).  Plaintiff contends that

Morgan Stanley made such a "clear and unambiguous promise," when it "guaranteed

liquidity." Pl. Opp., 30.  As the Court concluded above, Byrne's statements to Broce that

Morgan Stanley's SLARS would provide Ashland with liquidity and protection from the

subprime mortgage crisis, and  any statement that Morgan Stanley would intervene if

necessary to maintain the markets were not clear and unambiguous promises, inasmuch

as the Morgan Stanley statement of ARS Policies and Practices made clear that "Morgan

Stanley is not obligated to bid in any auction to prevent an auction from failing" and that

"[i]nvestors should not assume that Morgan Stanley will" bid to prevent auction failure.

Exh. B to Musoff Decl., at 4-5.  Additionally, any promise to act was so vague and

indefinite that reliance upon that promise, especially in the context of the complex

financial markets of the summer and fall of 2007, cannot be said to be reasonable.  For these reasons, Count III is dismissed with prejudice.

**E. Counts IV, V, VI, VII: Breach of Fiduciary Duty, Negligence, Negligent Misrepresentation, and Unjust Enrichment**

Defendant argues that the Plaintiffs' state law claims involving breach of fiduciary duty, negligence, negligent misrepresentation, and unjust enrichment are preempted by New York's Martin Act, "which makes it unlawful to, among other things, use or employ 'any fraud where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities. . . ."  *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 409 (S.D.N.Y. 2005) (quoting N.Y. Gen. Bus. Law § 352-c(1)). Plaintiffs contend, however, that these claims are not preempted because the SLARS were marketed to Plaintiffs outside of New York.

The Martin Act preempts certain common law claims in securities fraud cases which take place "within or from" the state of New York.  N.Y. Gen. Bus. Law § 352-c(1); *see also Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001). "The Martin Act preempts, at least, the following common law claims when they are predicated on the purchase or sale of securities within or from New York: negligence, breach of fiduciary duty; negligent misrepresentation; [and] unjust enrichment."  *Abu Dhabi Comm. Bank v. Morgan Stanley & Co., Inc.*, 651 F. Supp. 2d 155, 172 (S.D.N.Y. 2009).

Some courts in this district have found that the Martin Act does not preempt New York state common law claims in securities cases where the "plaintiffs may have interacted with defendants exclusively outside of New York."  *Fraternity Fund Ltd. v.*

*Beacon Hill Asset Mgmt LLC*, 376 F. Supp. 2d 385, 410 (S.D.N.Y.2005); *see also Nanopierce Tech., Inc. v. Southridge Cap. Mgmt LLC*, 2003 WL 22052894, at *5-*6 (S.D.N.Y. 2003); *Lehman Bros. Commercial Corp. v. Minmetals Intern. Non-Ferrous Metals*, 179 F. Supp. 2d 159, 165 (S.D.N.Y. 2001) ("Lehman traders in London and Hong Kong negotiated the sale of these securities with Hu, who was situated in Beijing. Accordingly, the Martin Act does not preclude Defendants' claims for negligence, negligent misrepresentation and breach of fiduciary duty because the FX transactions and the interest-rate swaps did not involve securities, and the NCDs, although securities under the Act, were not sold within or from New York.").  However, a claim will be preempted under the Martin Act if a "substantial portion of the events giving rise to a claim occurred in New York." *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 611 n. 9 (S.D.N.Y. 2008).  Indeed, some courts have found that where venue is appropriate in New York, the Martin Act will apply and preempt the state law claims. *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 422 (S.D.N.Y. 2007) (citing *Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*, 2005 WL 1902780, at *22 (S.D.N.Y. 2005)).  At least one court has held that where "the Amended Complaint specifically states that it arises under New York law," this fact is persuasive in determining whether the Martin Act preempts.  *Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 331 (S.D.N.Y. 2006).

Here, the FAC alleges that venue is proper in the Southern District of New York. FAC, ¶20.  The FAC alleges that the Defendant's principal place of business is in New York and that the Defendant is incorporated in Delaware. *Id*. at ¶18.  The Plaintiffs are incorporated in Kentucky and Delaware, doing business in Kentucky. *Id*. at ¶¶16, 17. The FAC alleges that Ashland's contact with the Defendant generally involved phone

calls from Broce in Kentucky to Byrne in Chicago.  *Id*. at ¶27.  The FAC mentions other Morgan Stanley employees with whom Ashland had contact, but does not specify whether they were in Chicago with Byrne or in the New York headquarters of Morgan Stanley.  *See, e.g. id.*, ¶86.  The Defendant contends that though Plaintiff's orders were not made from New York, they "were executed in New York, which is the principal place of all of Morgan Stanley's business – including its ARS business."  Def. Mot., 16.  At oral argument, the Plaintiffs acknowledged that auctions took place and that trade confirmations originated from New York.  Tr. 43.  Most importantly, Plaintiffs "concede[d] that the mechanics of the transaction get routed through New York."  Tr. 44.

In sum: Morgan Stanley's principal place of business is in New York, the auctions took place in New York, the mechanics of the transaction occurred in New York, venue is proper in New York and the FAC invokes only NY and federal law.  These facts, taken together, compel the conclusion that a "substantial portion of events giving rise to" this claim have occurred in New York.  *Heller*, 590 F. Supp. 2d at 611 n. 9.  Therefore, the state law claims of breach of fiduciary duty, negligence, negligent misrepresentation, and unjust enrichment are preempted by the Martin Act.  Counts IV, V, VI, and VI are dismissed with prejudice.

## III. Conclusion

For the reasons described herein, the Plaintiffs' 10(b)(5) claim is dismissed

without prejudice. All claims contained in the First Amended Complaint are dismissed

with prejudice. Judgment is entered for the Defendant.

IT IS SO ORDERED.

Dated: New York, New York
      March _3ə_, 2010

Robert P. Patterson, Jr.

U.S.D.J.

Copies of this order were faxed to:

**Charles Matthew Miller, Christopher Paul Johnson, & Joshua Moses Greenblatt**
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York , NY 10019
(212) 506-1700
Fax: (212) 506-1800

**Scott D. Musoff, John K. Carroll**
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
42nd floor
New York , NY 10036
212-735-3000
Fax: 212-735-2000